# United States Court of Appeals

## *for the*

## Fourth Circuit

ESTATE OF JADA JOHNSON; L.J., the minor daughter of Jada Johnson; RICHARD IWANSKI, individually, as Executor of the Estate of JADA JOHNSON and Guardian of L.J.; MARIA IWANSKI, individually, as Executor of the Estate of JADA JOHNSON and Guardian of L.J.,

*Plaintiffs-Appellants,*

– v. –

SERGEANT TIMOTHY RUGG, individually; OFFICER ZACHARIUS BOROM, individually; JOHN AND JANE DOES 1-100, CITY OF FAYETTEVILLE EMPLOYEES AND POLICE OFFICERS,

*Defendants-Appellees,*

– and –

CITY OF FAYETTEVILLE,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NORTH CAROLINA AT RALEIGH

## BRIEF OF PLAINTIFFS-APPELLANTS

CARNELL T. JOHNSON
JOHNSON & NICHOLSON, PLLC
5806 Monroe Road, Suite 102
Charlotte, North Carolina 28212
(704) 325-8057

*Counsel for Plaintiffs-Appellants*

COUNSEL PRESS
A Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (815466)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No.  25-2514          Caption:  Estate of Jada Johnson v. Timothy Rugg

Pursuant to FRAP 26.1 and Local Rule 26.1,

 Estate of Jada Johnson
(name of party/amicus)

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Carnell Johnson                    Date:    January 7, 2026

Counsel for: Estate of Jada Johnson

- 2 -

Print to PDF for Filing          Reset Form

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-2514__     Caption: __Estate of Jada Johnson v. Timothy Rugg__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__L.J., the minor daughter of Jada Johnson__
(name of party/amicus)

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2. Does party/amicus have any parent corporations? ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
   If yes, identify all such owners:

12/01/2019 SCC         - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Carnell Johnson                    Date: January 7, 2026

Counsel for: L.J., the minor daughter of Jada Johnson

- 2 -

| Print to PDF for Filing | | Reset Form |

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No.  25-2514          Caption:  Estate of Jada Johnson v. Timothy Rugg

Pursuant to FRAP 26.1 and Local Rule 26.1,

 Richard Iwanski, individually, as executor of the Estate of Jada Johnson and guardian of L.J.
(name of party/amicus)


 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                            ☐YES ☑NO
      If yes, identify all such owners:

12/01/2019 SCC                          - 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Carnell Johnson          Date:    January 7, 2026

Counsel for: Richard Iwanski

- 2 -

Print to PDF for Filing          Reset Form

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No.  __25-2514__      Caption:  Estate of Jada Johnson v. Timothy Rugg

Pursuant to FRAP 26.1 and Local Rule 26.1,

 Maria Iwanski, individually, as executor of the Estate of Jada Johnson and guardian of L.J.
(name of party/amicus)


 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO


2.      Does party/amicus have any parent corporations?   ☐ YES ☑ NO
        If yes, identify all parent corporations, including all generations of parent corporations:


3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO
        If yes, identify all such owners:


12/01/2019 SCC                          - 1 -

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?     ☐YES ☑NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?     ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: __s/ Carnell Johnson_____     Date: ____January 7, 2026____

Counsel for: __Maria Iwanski_____

- 2 -

Print to PDF for Filing     Reset Form

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .................................................................................iv

JURISDICTIONAL STATEMENT .....................................................................1

STATEMENT OF ISSUES ..................................................................................1

STATEMENT OF THE CASE..............................................................................2

    PROCEDURAL BACKGROUND ................................................................2

    STATEMENT OF RELEVANT FACTS........................................................4

        Fayetteville Police Department Officers Respond to Home
        Invasion Call............................................................................................4

        Defendant Borom Confirms Ms. Johnson's Mental Health
        Issues ........................................................................................................6

        Ms. Johnson Displays Mental Health Issues in Living Room ..............7

        Defendant Rugg Learns about Ms. Johnson's Mental Health
        Issues ........................................................................................................7

        Ms. Johnson Asks to be Hospitalized, Defendants Fail to Call
        CIT Officers .............................................................................................8

        Officer Sori's Departure, Defendants Escalate Ms. Johnson................9

        Ms. Johnson Retrieves a Handgun, Defendants Fail to Take
        Action ......................................................................................................11

        Ms. Johnson Calls Ex-Boyfriend, Defendants Take No Action ........14

        Ms. Johnson Waves Handgun While Repositioning Herself..............16

        Defendant Rugg Tackles Ms. Johnson, Defendant Borom
        Shoots 16 Times and Kills Her ............................................................16

SUMMARY OF ARGUMENT ..........................................................................23

STANDARD OF REVIEW ................................................................................24

ARGUMENT ......................................................................................................27

I.      The district court erred in denying Plaintiffs' Motion for Partial
        Summary Judgment as to Count I ...........................................................27

i

a. Even in the light most favorable to Defendants, Defendant Borom violated Ms. Johnson's clearly established Fourth Amendment rights through excessive force when he killed her by shooting eight bullets at her after she had already been shot eight times and was incapacitated, after it was clear *from Defendant Borom's vantage* point that Sgt. Rugg had regained possession of the gun...........................................................27

b. Even in the light most favorable to Defendants, Defendant Rugg's inactions render him liable for Officer Borom's excessive force. ......................................................................35

II. The district court erred in granting Defendants' Motions for Summary Judgment as to Count I ...................................................37

a. In the light most favorable to Plaintiffs, Defendant Borom violated Ms. Johnson's clearly established Fourth Amendment rights through excessive force when he initiated his first volley of shots at Ms. Johnson ...............................................37

b. In the light most favorable to Plaintiffs, Defendant Borom violated Ms. Johnson's clearly established Fourth Amendment rights through excessive force when he killed her by shooting nine bullets at her after she had already been shot seven times and was incapacitated......................................................42

c. In the light most favorable to Plaintiffs, Defendant Rugg's inactions render him liable for Officer Borom's excessive force ...........................................................................48

III. The district court erred in granting Defendants' Motions for Summary Judgment as to the state law counts ...............................49

a. In the light most favorable to Plaintiffs, Defendants' actions were both outside the scope of their duties and malicious due to their unreasonable use of force ......................................................50

i. Public official immunity does not apply to law enforcement action that is malicious or outside the scope of authority....................................................................50

ii. Defendants are not entitled to public official immunity due to their unreasonable use of force ......................................53

b.  In the light most favorable to Plaintiffs, Defendants' actions were outside the scope of their duties due to their failure to abide by departmental policies governing interactions with individuals experiencing mental illness ...............................................55

CONCLUSION ...................................................................................................57

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS ........................................................................59

**Cases:**

Aleman v. City of Charlotte,
 80 F.4th 264 (4th Cir. 2023), cert. denied,
 144 S. Ct. 1032, 218 L. Ed. 2D 187 (2024)..................................................*passim*

Anderson v. Liberty Lobby, Inc.,
 477 U.S. 242, 106 S. Ct. 2505 (1986).............................................................25

Armstrong v. Hutcheson,
 80 F.4th 508 (4th Cir. 2023) ...........................................................................46

Barnes v. Felix,
 605 U.S. 73 (2025)...................................................................................22, 39, 48

Brockington v. Boykins,
 637 F.3d 503 (4th Cir. 2011) ...................................................................*passim*

Caraway v. City of Pineville,
 639 F. Supp. 3d 560 (W.D.N.C. Nov. 3, 2022).............................................33, 34

Celotex Corp. v. Catrett,
 477 U.S. 317, 106 S. Ct. 2548 (1986).............................................................25

Cloaninger ex rel. Est. of Cloaninger v. McDevitt,
 555 F.3d 324 (4th Cir. 2009) ...........................................................................50

Cooper v. Sheehan,
 735 F.3d 153 (4th Cir. 2013) .................................................................39, 52, 53

Doriety for Est. of Crenshaw v. Sletten,
 109 F.4th 670 (4th Cir. 2024) ..........................................................................26

Elliott v. Leavitt,
 99 F.3d 640 (4th Cir. 1996) .............................................................................32

Epps v. Duke Univ., Inc.,
 116 N.C. 305, 447 S.E.2d 444 (1994) .............................................................57

Est. of Graham v. Lambert,
 385 N.C 644, 898 S.E.2d 888 (2024) .........................................................50-51

Estate of Jones v. City of Martinsburg,
 961 F.3d 661 (4th Cir. 2020) .....................................................................28, 42

Franklin v. City of Charlotte,
    64 F.4th 519 (4th Cir. 2023) ...............................................45, 47, 48, 53

Grad v. Kaasa,
    312 N.C. 310, 321 S.E.2d 888 (1984) .................................................54

Graham v. Connor,
    490 U.S. 386 (1989)...........................................................................22

Harris v. Pittman,
    927 F.3d 266 (4th Cir. 2019) ......................................................passim

Harrold v. Hagan,
    ___ F.4th ___, 2026 WL 1145569 (Apr. 28, 2026)............................28

Hart v. Brienza,
    246 N.C. App. 426, 784 S.E.2d 211 (2016) ................................51, 53

Henry v. Purnell,
    652 F.3d 524 (4th Cir. 2011) ......................................................passim

Hensley on Behalf of North Carolina v. Price,
    876 F.3d 573 (4th Cir. 2017) ......................................................51, 52

Iko v. Shreve,
    535 F.3d 225 (4th Cir. 2008) .............................................................25

Jean-Baptiste v. Gutierrez,
    627 F.3d 816 (11th Cir. 2010) ...........................................................31

Knibbs v. Momphard,
    30 F.4th 200 (4th Cir. 2022) .......................................................passim

Lewis v. Caraballo,
    98 F.4th 521 (4th Cir. 2024) ........................................................26, 43

Lightner v. Inlivian,
    No. 3:23-cv-846-MOC-SCR,
    2025 WL 2405627 (W.D.N.C. Aug. 7, 2025) ....................................57

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574, 106 S. Ct. 1348 (1986)................................................25

McLenagan v. Karnes,
    27 F.3d 1002 (4th Cir. 1994) .............................................................32

Mills v. Duke Univ.,
234 N.C. App. 380, 759 S.E.2d 341 (2014) ........................................................53

Prior v. Pruett,
143 N.C. App. 612, 550 S.E.2d 166 (2001) .................................................51, 53

Putman v. Harris,
66 F.4th 181 (4th Cir. 2023) ..............................................................................46

Randall v. Prince George's Cnty., Md.,
302 F.3d 188 (4th Cir. 2002) ..............................................................................36

Remy Holdings Intl., LLC v. Fisher Auto Parts, Inc,
90 F.4th 217 (4th Cir. 2024) ..............................................................................40

Sawyer v. Asbury,
537 F. App'x 283 (4th Cir. 2013) .......................................................................26

Scott v. Harris,
550 U.S. 372, 127 S. Ct. 1769 (2007)................................................25, 26, 43, 46

Showalter v. N. Carolina Dep't of Crime Control & Pub. Safety,
183 N.C. App. 132, 643 S.E.2d 649 (2007) .......................................................50

Simmons v. Whitaker,
106 F.3d 379 (4th Cir. 2024) ..............................................................................36

Smith v. State,
289 N.C. 303, 222 S.E.2d 412 (1976) ...............................................................51

United States v. McIver,
470 F.3d 550 (4th Cir. 2006) ..............................................................................40

United States v. Perez,
30 F.4th 369 (4th Cir. 2022) ..............................................................................25

Waterman v. Batton,
393 F.3d 471 (4th Cir. 2005) ......................................................................*passim*

Wilcox v. City of Asheville,
222 N.C. App. 285, 730 S.E.2d 226 (2012) ...........................................51, 52, 54

Witt v. West Virginia State Police, Troop 2,
633 F.3d 272 (4th Cir. 2011) ..............................................................................26

**Statutes & Other Authorities:**

U.S. Const. Amend. IV ................................................................*passim*

8 U.S.C. § 1983 .......................................................................50

28 U.S.C. § 1291 .......................................................................1

28 U.S.C. § 1343 .......................................................................1

28 U.S.C. § 1367 .......................................................................1

28 U.S.C. § 1367(a) ...................................................................1

42 U.S.C. § 1331 .......................................................................1

42 U.S.C. § 1983 .......................................................................1

Fed. R. Civ. Pro. 56 .................................................................25

N.C. Gen. Stat. § 15A-401(d)(2).................................................51

N.C. Gen. Stat. § 15A-401(d)(2)(a) ...........................................52

Petition for a Writ of Certiorari in Green v. Tanner, O.T. 2025, No. 267........46, 48

# JURISDICTIONAL STATEMENT

The district court had jurisdiction over the underlying proceedings pursuant to 42 U.S.C. § 1331, 28 U.S.C. 1343, and 28 U.S.C. § 1367. Count I of Plaintiffs' Complaint seeks recourse for the Plaintiffs based on a violation of constitutional rights under 42 U.S.C. § 1983. Counts II-IX seek recourse based on tortious conduct under North Carolina law, arising from the same facts as Count I, such that they "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a).

The district court issued its final order denying Plaintiffs' motion for partial summary judgment and granting Defendants' motions for summary judgment, disposing of all remaining claims, on November 25, 2026. Plaintiffs timely filed their Notice of Appeal on December 22, 2025. This Court has jurisdiction to review the decision of the district court pursuant to 28 U.S.C. § 1291.

# STATEMENT OF ISSUES

(1) Whether the district court erred in denying Plaintiffs' Motion for Partial Summary Judgment as to Count I and in granting Defendant Rugg's Motion for Summary Judgment as to Count 1; and

(2) Whether the district court erred in granting Defendant Borom's Motions for Summary Judgment as to Count I; and

(3) Whether the district court erred in granting Defendants' Motions for Summary Judgment as to the state law counts.

1

## STATEMENT OF THE CASE

### PROCEDURAL BACKGROUND

On April 7, 2023, Plaintiffs filed the Complaint that gave rise to this matter. (JA20). On June 26, 2023, Plaintiffs filed a First Amended Complaint. (JA34-72). On June 28, 2023, Defendant City of Fayetteville filed a Motion to Dismiss. (JA23). On August 2, 2023, the district court stayed discovery pending adjudication of the Motion to Dismiss. (JA24). On December 1, 2023, the district court granted Defendant City of Fayetteville's Motion to Dismiss, dismissed it as a defendant, and lifted the stay on discovery, permitting Plaintiffs to proceed against the remaining Defendants. (JA24).

On May 23, 2025, Plaintiffs timely filed a Motion for Partial Summary Judgment (JA147-150), a supporting Memorandum of Law with exhibits (JA1256-1622), and a Statement of Material Facts along with an appendix and an exhibit (JA1623-1645, JA151-163).

On July 7, 2025, Defendant Borom filed his Response Brief in Opposition to Plaintiffs' Motion for Summary Judgment) (JA1080-1107) and his Statement Opposing Plaintiffs' Statement of Material Facts (JA1108-1117). That same day, Defendant Borom also filed his Motion for Summary Judgment. (JA164-166), a supporting Memorandum of Law (JA1989-2020), and a Statement of Material Facts, along with an appendix and exhibits (JA1646-1988, JA167-1079).

On July 7 and 8, 2025, Defendant Rugg filed his Memorandum of Law in Response to Plaintiffs' Motion for Summary Judgment) (JA1140-1146) and his Statement in Response to Plaintiffs' Statement of Material Facts (JA1130-1139). On July 7, 2025, Defendant Rugg also filed his Motion for Summary Judgment with an exhibit. (JA1118-1129) and a Statement of Material Facts in Support of Motion for Summary Judgment. (JA2021-2024). On July 11, 2025, Defendant Rugg filed a supporting Memorandum of Law in Support of Motion for Summary Judgment with an exhibit (JA1147-1175).

On August 4, 2025, Plaintiffs filed their reply briefs (including objections to facts not supported by admissible evidence) to Defendant Borom's and Defendant Rugg's respective responses to Plaintiffs' Motion for Partial Summary Judgment. (JA2025-2043, JA2044-52).

On August 18, 2025, Plaintiffs filed their Objection to Facts Not Supported by Admissible Evidence (JA2053-2058), their responses in opposition to Defendant Borom's and Defendant Rugg's respective motions for summary judgment (JA2068-2081, JA2089-2101), and their responses to Defendant Borom's and Defendant Rugg's respective statements of material facts. (JA2059-2067, JA2082-2088).

On August 20, 2025, Defendant Borom filed his Reply Brief in Support of His Motion for Summary Judgment (JA1180-1191), and Defendants filed a Joint Response to Plaintiffs' Objections, With Exhibit. (JA1192-1210).

The district court held a hearing on the parties' various summary judgment motions on October 2, 2025. (JA1211-1251). On November 25, 2025, the district court issued an Order denying Plaintiffs' Motion for Partial Summary Judgment, granting Defendants' motions for summary judgment, and entering a judgment in favor of Defendants on all counts. (JA1-17).

Plaintiffs timely filed their Notice of Appeal on December 22, 2025. (JA1252-1255). On April 3, this Court granted Plaintiffs' motion to extend the briefing schedule and extended the opening brief deadline to June 3, 2026. This timely appeal follows.

<u>STATEMENT OF RELEVANT FACTS</u>

**Fayetteville Police Department Officers Respond to Home Invasion Call**

On the evening of July 1, 2022, Fayetteville Police Department ("FPD") officers responded to a home invasion call at 2308 Colgate Drive, Fayetteville, North Carolina. (JA1460-1462, JA1311). Defendant Officer Zacharius Borom ("Defendant Borom") arrived with Officer Jordan Sori and a ride-along, and Defendant Sergeant Timothy Rugg ("Defendant Rugg") arrived shortly thereafter. (JA1312, JA1463-1464).

The FPD has a Crisis Intervention Team ("CIT"), which consists of CIT certified officers who have specialized mental health training. (JA159-163). FPD policy indicates that if the first arriving officer determines there is a mental health situation, they will request a CIT certified officer. (JA160). FPD policy requires officers not to threaten or agitate people suspected to be mentally ill. (JA160). All of the responding officers were wearing FPD uniforms. (Rugg's BWC 1, 0:38-0:52).

Upon entering the house, the officers saw in the living room Ms. Jada Johnson ("Ms. Johnson"), Plaintiff Richard Iwanski ("Mr. Iwanski"), Plaintiff Maria Iwanski ("Mrs. Iwanski"), and Plaintiff L.J. ("L.J."). (Borom's BWC 1, 0:01-0:28). Visibly distressed, Ms. Johnson explained that she called the police because she was afraid of her ex-boyfriend, who was stalking her, intended to kill her and harm her family, and had attempted to break into the house. (Boron's BWC 1, 0:46-2:04).



(Rugg's BWC 1, 0:54).

**Defendant Borom Confirms Ms. Johnson's Mental Health Issues**

A few minutes into their first interaction, Defendant Borom stepped away from the living room with Mr. Iwanski to talk privately. (Borom's BWC 1, 2:04). Defendant Borom revealed that he had actually been to the house two days prior, in response to a 911 call and discussed Ms. Johnson's mental health condition with Mr Iwanski. (Rugg's BWC 1, 2:04; JA1444-1446, JA1467-1470). Mr. Iwanski frankly told Defendant Borom that Ms. Johnson had mental health issues, probably "paranoia, schizophrenia," which made her believe that the officers were working for her ex-boyfriend and that her ex-boyfriend was everywhere she went. (Borom's BWC 1, 3:08-6:46). Defendant Borom recommended that Mr. Iwanski involuntary

commit Ms. Johnson, repeating several times that there was not much the police could do, even saying that law enforcement was not allowed to allay her fears. Id.

Eventually, Ms. Johnson approached Defendant Borom and Mr. Iwanski, wanting to inspect the back door, because that was the door she believed her ex-boyfriend tried to kick down. (Borom's BWC 1, 7:08-9:51). Defendant Borom and Mr. Iwanski assured and showed Ms. Johnson that this had not happened. Id.

**Ms. Johnson Displays Mental Health Issues in Living Room**

After inspecting the back door, everyone returned to the living room area. (Borom's BWC 1, 9:52-9:56). For several minutes, Ms. Johnson continued to explain her fears, detailing that someone had recently shot up the house; that four people were trying to break in the house earlier that evening; that her ex-boyfriend was threatening to kill her; that she was being followed around town and hospitalized; that no one believed that she was being followed by fake police officers; and that people were trying to shoot and kill her. (Borom's BWC 1, 10:06-19:04).

**Defendant Rugg Learns about Ms. Johnson's Mental Health Issues**

As the conversation began in the living room, Defendant Rugg engaged Mr. Iwanski in conversation, right next to the living room, close to the front door. (Rugg's BWC 1, 10:04-10:08). They discussed how the exterior cameras near the back door had not activated, contrary to Ms. Johnson's beliefs. (Rugg's BWC 1,

10:12-12:26). Defendant Rugg and Mr. Iwanski then went to the back door by the kitchen area to have a private conversation. (Rugg's BWC 1, 12:28).

In private, Mr. Iwanski agreed that there had not been an attempted break-in, confirming this information with the exterior camera recordings on his phone. (Rugg's BWC 1, 13:11-15:54). Mr. Iwanski explained that Ms. Johnson had experienced a mental health crisis a few days prior, resulting in a two-day, voluntary hospitalization. (Rugg's BWC 1, 15:50-16:23). As with Defendant Borom, Mr. Iwanski explained to Defendant Rugg that Ms. Johnson was "paranoid, schizophrenia" two days prior, thinking everyone was going to kill her, just like that night. (Rugg's BWC 1, 16:23-16:40). Mr. Iwanski pleaded to Defendant Rugg that they help Ms. Johnson instead of charging her with misuse of 911. (Rugg's BWC 1, 16:49-17:30).

**Ms. Johnson Asks to be Hospitalized, Defendants Fail to Call CIT Officers**

Following their conversation in the kitchen, Defendant Rugg and Mr. Iwanski returned to the living room where Ms. Johnson, Officer Sori, Defendant Borom, and Mrs. Iwanski were still discussing Ms. Johnson's fears. (Rugg's BWC 1, 17:48; Borom's BWC 1, 19:11). Defendant Rugg directly asked Ms. Johnson twice if she had been diagnosed with mental health issues, aggravating Ms. Johnson, who insisted that she and her family were in danger. (Rugg's BWC 1, 18:48-24:40). Eventually, Ms. Johnson asked to be readmitted to the hospital.

8

(Rugg's BWC 1, 25:57). After a back-and-forth, Ms. Johnson agreed to go in an ambulance, and Defendant Borom radioed dispatch for one. (Borom's BWC 1, 27:50-28:00). While waiting for the ambulance, Defendant Borom confirmed that the ex-boyfriend was a real person previously charged with multiple felonies. (JA1475-1478). Defendants Borom and Rugg momentarily stepped outside of the house to confer on this topic. (JA1476-1478, JA1508-1510).

Defendant Borom knew of FPD's CIT officers. (JA1456-1458). At no point did Defendant Borom dispatch or call for assistance of a CIT officer or other similar agent. (Borom's's BWC 1, Borom's's BWC 2). Likewise, Defendant Rugg knew of FPD's CIT officers. (JA1298-1299). At no point did Defendant Rugg dispatch or call for any further mental health assistance. (See Rugg's BWC 1, Rugg's BWC 2). In fact, against policy, Defendant Rugg has never dispatched or called for assistance of a CIT officer, despite facing this situation ten to fifteen times before. (JA1304-1307).

**Officer Sori's Departure, Defendants Escalate Ms. Johnson**

After Defendants Rugg and Borom returned to the living room, the officers informed Ms. Johnson that they were going to leave, that an ambulance would come as soon as it was available, and that Defendant Borom would remain outside in his vehicle to watch over the house. (Rugg's BWC 2, 1:50-2:15). However, Ms. Johnson continued to suspect that the officers were working with her ex-

9

boyfriend, going back and forth on who would take her to the hospital. (Rugg's BWC 2, 27:39-13:07). After waiting for some time for an ambulance, Officer Sori and the ride-along appropriately left the house, but Defendants Borom and Rugg remained behind. (Rugg's BWC 2, 13:08).

Once Officer Sori left, Ms. Johnson crossed to the front door to lock it. (Rugg's BWC 2,13:32). Defendant Rugg told Ms. Johnson to stop locking the front door while they were still inside. (Rugg's BWC 2, 15:05). Ms. Johnson told Defendants Rugg and Borom that they were scaring her. (Rugg's BWC 2,15:45). Next to the front door, Ms. Johnson insisted on calling the police while Mrs. Iwanski attempted to calm her down by reminding her that the police were already there. (Rugg's BWC 2,16:08-16:42; Borom's BWC 2, 0:01-0:14).

After Ms. Johnson and Mrs. Iwanski discussed the police's presence, Defendant Rugg sternly told Ms. Johnson, "This is the kind of crap that is going to get you in jail. Do you understand what I'm saying?" (Rugg's BWC 2,16:55; Borom's BWC 2, 0:26). Defendant Rugg then yelled, "You don't call the police when the police are standing in your living room . . . . [W]e are almost done with this. Do you understand what I'm saying?" Id. Once again, Ms. Johnson asked that the ambulance be called, and Defendant Rugg replied that it was already on the way. (Rugg's BWC 2, 17:09; Borom's BWC 2, 0:42).

After Defendant Rugg threatened Ms. Johnson with arrest, she produced a handgun, pointed it at her head, and stated, "I'm going to kill myself". (Rugg's BWC 2,17:13; Borom's BWC 2, 0:45). Ms. Johnson had the firearm in her waistband, and this was the first time that the officers saw it. (JA1501). Defendant Rugg was close to Ms. Johnson; Defendant Borom was some feet away in the living room; Mr. Iwanski was near the kitchen; and Mrs. Iwanski was close to Defendant Borom. (Rugg's BWC 2, 17:13; Borom's BWC 2, 0:45).



(Rugg's BWC 2 0:53).

Defendant Borom instructed Ms. Johnson to put the gun down, but she requested an ambulance again, prompting Defendant Rugg to tell Defendant Borom to contact dispatch and inform them that Ms. Johnson was having trouble

breathing. (Rugg's BWC 2, 17:19-17:23; Borom's BWC 2, 0:51-0:52). A few seconds later, only Defendants Borom and Rugg remained in Ms. Johnson's direct line of sight near the front door. (Rugg's BWC 2, 17:45; Borom's BWC 2, 1:25).

Unprompted, Ms. Johnson crouched down, placed the handgun on the ground while keeping her hand above the firearm, and asked if the officers were going to kill her, to which Defendants Rugg and Borom responded they were not. (Rugg's BWC 2, 17:53-18:11; Borom's BWC 2, 1:28-1:42).



(Borom's BWC 2, 1:35).

Still crouching, Ms. Johnson again asked for Mrs. Iwanski to call the "real police," and Defendants Borom and Rugg allowed Mrs. Iwanski to get close to Ms. Johnson. (Rugg's BWC 2, 17:53-18:18; Borom's BWC 2, 1:28-1:50). Ms. Johnson picked up the handgun and placed it to her head again, demanding her phone.

(Rugg's BWC 2, 18:31; Borom's BWC 2, 2:04). Defendant Borom instructed Mrs. Iwanski to retrieve the phone, and so she left Ms. Johnson's line of sight to do so. (Rugg's BWC 2, 18:29-18:18:39; Borom's BWC 2, 2:00-2:10).

Ms. Johnson then stood up, lowering the hand holding the handgun so that it was pointed at the ground, and began demanding that L.J. be brought to her. (Rugg's BWC 2, 19:00; Borom's BWC 2, 2:35). Defendants allowed Mrs. Iwanski to bring L.J. to Ms. Johnson. (Rugg's BWC 2, 19:46; Borom's BWC 2, 3:06). L.J. was visibly distraught, crying, and saying that she was scared. Id.

Defendant Borom told Mr. Iwanski to bring a chair over to Ms. Johnson, and Mr. Iwanski did so, coming into Ms. Johnson's line of sight. (Rugg's BWC 2, 20:46; Borom's BWC 2, 4:18-4:34). Ms. Johnson sat down with the handgun facing to the floor, and Defendants Borom and Rugg allowed Plaintiffs in and out of her line of sight, while she repeated that she thought the officers would shoot her. (Rugg's BWC 2, 20:46-23:52; Borom's BWC 2, 4:18-7:21).

After seeing Defendant Borom walk into the hallway and asking him what he was doing, Ms. Johnson stood up, took hold of Mrs. Iwanski's arm—who was holding L.J.—and pulled her across the room. (Rugg's BWC 2, 23:53-23:56; Borom's BWC 2, 7:21-7:29). At this point, Ms. Johnson moved to the other side of the room, ultimately positioning herself with her back against a wall, in between the front door and kitchen area. Id. Mrs. Iwanski stood on Ms. Johnson's left side, while

13

Ms. Johnson held the handgun in her right hand, pointing it toward the floor. Id. Defendant Rugg moved to Ms. Johnson's right. Id. Defendant Borom moved to a position where he had a more direct line of sight to Ms. Johnson, closer to the location of a chair by the fireplace. Id. As when Ms. Johnson was sitting down, Defendants Borom and Rugg allowed the Plaintiffs in and out of her line of sight, as everyone spoke with her about EMS, the exterior cameras' security footage, and the general situation. (Rugg's BWC 2, 24:36-27:58; Borom's BWC 2, 8:08-11:28).

**Ms. Johnson Calls Ex-Boyfriend, Defendants Take No Action**

Several minutes later, Ms. Johnson asked Defendant Borom to give Ms. Johnson her phone, and Defendant Borom directed Mr. Iwanski to hand it over, which Mr. Iwanski did. (Rugg's BWC 2, 29:33-29:54; Borom's BWC 2, 13:05-13:22). To make the call, Ms. Johnson took the phone in her left hand, releasing her hold on Mrs. Iwanski and L.J., while continuing to hold the handgun in her right hand, pointing it towards the ground. (Rugg's BWC 2, 31:25).

Ms. Johnson appeared to talk to her ex-boyfriend and told him that the police were there, she was going to die, and she knew he was outside. (Rugg's BWC 2, 31:27-31:50; Borom's BWC 2, 14:56-15:30). Ms. Johnson spoke on the phone for a few minutes, while Mr. Iwanski and Mrs. Iwanski held a crying L.J. in turns, right next to Ms. Johnson, and Defendant Rugg stood on the other side. (Borom's BWC 2,

14

15:30-17:30). Mr. Iwanski eventually sat down in the dining room, in the kitchen area. (Borom's BWC 2, 17:36).



(Borom's BWC 2, 17:45).

With L.J. and Mrs. Iwanski right next to her, Ms. Johnson remained on the phone for several more minutes, negotiating with her ex-boyfriend about her life, relaying messages with Defendant Borom, and at one point momentarily handing the phone over to Mrs. Iwanski. (Borom's BWC 2, 17:39-24:58). Ultimately, Ms. Johnson told her ex-boyfriend to bring her fentanyl so that she could die without being shot in front of her daughter, who was still being held by Mrs. Iwanski, in between Ms. Johnson and Defendants. (Rugg's BWC 2, 41:27; Borom's BWC 2, 24:59). Ms. Johnson began demanding that Mr. Iwanski retrieve pills for her. (Rugg's BWC 2, 42:44; Borom's BWC 2, 26:15). Defendant Borom directed Mr.

Iwanski to go get pills for Ms. Johnson. (Rugg's BWC 2, 43:03; Borom's BWC 2, 26:34).

**Ms. Johnson Waves Handgun While Repositioning Herself**

As the phone call and conversations continued, Defendant Borom told Ms, Johnson that she had her handgun pointed at Defendant Rugg. (Borom's BWC 2, 27:07-27:10). The handgun is not visible in Defendant Rugg's line of sight. (Rugg's BWC 2, 43:31-43:37). In reality, Ms. Johnson ended up pointing the handgun towards Defendant Rugg, apparently inadvertently, for approximately thirty (30) seconds. (JA1399-1403). Defendant Rugg chuckled after Defendant Borom made the statement about the handgun being pointed at him. (Rugg's BWC 2, 43:38). When Officer Borom pointed out that the gun was briefly pointed at Sgt. Rugg, Ms. Johnson moved the gun so that it was no longer pointed at him. (JA1399-1403). Defendant Rugg did not think that Ms. Johnson was homicidal. (JA1403-1404). Following the commands of Defendants, Mr. Iwanski delivered a bottle of pills to Ms. Johnson. (Borom's BWC 2, 27:20-27:28).

**Defendant Rugg Tackles Ms. Johnson, Defendant Borom Shoots
16 Times and Kills Her**

After Mr. Iwanski handed over the pill bottle to Ms. Johnson, she placed the handgun under her left armpit in order to manipulate the bottle. (JA1388, JA1540-1541). Without warning, Defendant Rugg attempted to retrieve the handgun from Ms. Johnson by tackling her from the left side against the wall, resulting in

Defendant Rugg and Ms. Johnson quickly falling to the ground into the kitchen area, as Defendant Rugg tried to physically take away the handgun from Ms. Johnson. (Rugg's BWC 2, 44:39; Borom's BWC 2, 27:31).

Defendant Borom ran from the back of the living room to where Ms. Johnson and Defendant Rugg were on the ground, in the kitchen area, near the dining table. (Borom's BWC 2, 27:32-27:34). After getting closer to Ms. Johnson and Defendant Rugg, without any warning to Ms. Johnson or Plaintiffs, Defendant Borom yelled "shot" as he fired his service weapon at Ms. Johnson. (Borom's BWC 2, 27:35-27:39). Defendant Borom shot Ms. Johnson seven times within three seconds. Id.



Borom's BWC 2, 27:32.



Borom's BWC 2, 27:34.

As the first shot was heard, Defendant Rugg grabbed the handgun out of Ms.
Johnson's hand, got up off the ground, and backed away from Ms. Johnson.
(Rugg's BWC 2, 44:00-44:08; Borom's BWC 2, 27:39). Yet Defendant Borom
continued to shoot. Id.



Borom's BWC 2, 27:39.

At the conclusion of Defendant Borom's seven gunshots, Ms. Johnson's handgun rested on the ground between her and Defendant Rugg, while Ms. Johnson bled on the floor. (Rugg's BWC 2, 44:09-44:11; Borom's BWC 2, 27:40). While Defendant Rugg remained next to Ms. Johnson and the handgun, Defendant Borom radioed for EMS, reporting that shots were fired. (Borom's BWC 2, 27:40-27:43).

Four to five seconds after Defendant Borom's seventh gunshot, Ms. Johnson's body jerked, and her hand moved towards the handgun on the floor. (Rugg's BWC 2, 44:11, Borom's BWC 2, 27:42). Defendant Borom immediately discharged his service weapon again, firing nine additional rounds at Ms. Johnson within four seconds. (Borom's BWC 2, 27:42-27:47). But by the time Defendant Borom fired the second gunshot of his second round of shots, Defendant Rugg had already

19

retrieved Ms. Johnson's handgun, again. (<u>Rugg's BWC 2</u>, 44:09-44:13; <u>Borom's BWC 2</u>, 27:44). Defendant Rugg did not believe that Ms. Johnson posed any threat at this time. (JA1398-1399).



<u>Borom's BWC 2</u>, 27:44.

By the time Defendant Borom got to the third gunshot of his second round of shots, Defendant Rugg, clearly visible from Defendant Borom's line of sight, had completely backed away from Ms. Johnson with the handgun. (<u>Rugg's BWC 2</u>, 44:12-44:16; <u>Borom's BWC 2</u>, 27:45-27:47).



Borom's BWC 2, 27:45.



Borom's BWC 2, 27:46.

21

After shooting Ms. Johnson nine times in the second round of shots, totaling sixteen gunshots, Defendant Borom put Ms. Johnson in handcuffs, radioed for EMS again, asked for a "med kit" to someone in the room, and flipped Ms. Johnson's body over with assistance from others in the room. (Borom's BWC 2, 28:00-29:04). After handcuffing and flipping Ms. Johnson, who remained immobile and bleeding, Defendant Borom began to compress Ms. Johnson's chest, attempting cardiopulmonary resuscitation ("CPR"). (Borom's BWC 2, 29:05-29:39). Ms. Johnson was unresponsive and not breathing. Id. Finally, EMS arrived and took over. (Borom's BWC 2, 29:39). Ms. Johnson sustained multiple gunshot wounds to her head and torso and was pronounced dead at the scene at 11:37 p.m. (JA1618).[1]

---

[1] Below, Defendants made much of various facts unknown to them at the time of the incident, including the detection of methamphetamine in her autopsy report. These facts are irrelevant to the grounds upon which the district court disposed of Ms. Johnson's claims—i.e., that Defendants' use of force was reasonable and that Defendants are accordingly protected by both qualified immunity and public official immunity. (JA12-14). However, the reasonableness of Defendants' use of force is to be determined with reference to the facts "as then known to the officer" at the time force was employed. See, e.g., Barnes v. Felix, 605 U.S. 73, 80 (2025) (citing Graham v. Connor, 490 U.S. 386, 396 (1989)). Facts that were unknown to Defendants at the time Ms. Johnson was killed cannot provide a *post hoc* justification for the reasonableness of their use of deadly force and therefore cannot provide any support for the Court's analysis below.

**SUMMARY OF ARGUMENT**

The district court erred in denying Plaintiffs' Motion for Partial Summary Judgment with respect to Count I. It is clearly established in this circuit that deadly force is unreasonable after the threat purportedly justifying such force has been eliminated—even seconds later. Nonetheless, even viewing the facts in the light most favorable to Defendants, Defendant Borom repeatedly shot Ms. Johnson as she lay wounded on the ground and had already been disarmed, which was visible from his vantage point. Further, notwithstanding Defendant Rugg's knowledge that Ms. Johnson was not a threat after she had been disarmed, Defendant Rugg did absolutely nothing to stop Officer Borom's continued use of unnecessary deadly force, rendering him liable under the doctrine of bystander liability.

The district court further erred in granting Defendants' motions for summary judgment. Beyond the reasons set forth above, in the light most favorable to Plaintiffs, all use of deadly force by Defendants against Ms. Johnson—who was suffering from mental illness but who posed a threat only to herself—was constitutionally unreasonable. Moreover, a reasonable jury could have concluded that Officer Borom was actually aware that Ms. Johnson had been disarmed as he continued to shoot her repeatedly, or that, to the extent he was unaware that she had been disarmed, such a mistake was unreasonable.

Finally, with respect to the state law claims, the district court erred in granting Defendants' motions for summary judgment on the grounds of public official immunity and on the ground that the officers' use of force was reasonable. With respect to public official immunity, the district court erred for four reasons. First, because Defendants are not entitled to qualified immunity, they are therefore likewise not entitled to public official immunity. Second, Defendants are not entitled public official immunity because they acted outside the scope of their lawful authority by using deadly force that was not reasonably necessary under the circumstances, in violation of North Carolina law. Third, Defendants are not entitled to public official immunity because they acted maliciously. Fourth, Defendants are not entitled to public official immunity because they acted outside the scope of their authority by virtue of their failure to abide by departmental policy governing interaction with individuals experiencing mental illness. In any event, whether Defendants are entitled to public official immunity necessitates resolution of factual questions within the province of the jury.

**STANDARD OF REVIEW**

This Court reviews de novo a district court's grant of summary judgment. See, e.g., Knibbs v. Momphard, 30 F.4th 200, 213 (4th Cir. 2022) (citing Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc)). The de novo review extends to district court findings regarding qualified immunity, public official immunity, and other state law defenses. Knibbs, 30 F.4th at 213.

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, 106 S. Ct. 2505, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (citation modified). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249, 106 S. Ct. 2505. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378, 127 S. Ct. 1769 (2007).

This matter involves body-worn camera footage, so generally speaking, the facts should be viewed in the light depicted on the videotape. United States v. Perez, 30 F.4th 369, 380 (4th Cir. 2022) (applying Scott, 550 U.S. at 381 (2007)); Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008). However, this Court has made

25

clear that "the principle articulated in <u>Scott</u> does not license a court to reject one side's account as a matter of law if the 'documentary evidence, such as a video,' merely 'offers *some* support for [the other side's] version of events.'" <u>Sawyer v. Asbury</u>, 537 F. App'x 283, 291 (4th Cir. 2013) (quoting <u>Witt v. West Virginia State Police, Troop 2</u>, 633 F.3d 272, 262 (4th Cir. 2011)). "Rather, the video controls only where it 'blatantly contradicts" one side's testimonial account." <u>Id.</u> (quoting <u>Scott</u>, 550 U.S. at 380) (citation modified). "As the phrase 'blatantly contradicts' implies, this standard is a very difficult one to satisfy and requires that the plaintiff's version of events be 'utterly discredited by the video recording." <u>Doriety for Est. of Crenshaw v. Sletten</u>, 109 F.4th 670, 679 (4th Cir. 2024) (quoting <u>Lewis v. Caraballo</u>, 98 F.4th 521, 529 (4th Cir. 2024)). <u>See</u> <u>also</u>, e.g., <u>Lewis</u>, 98 F.4th at 529 (quoting <u>Harris v. Pittman</u>, 927 F.3d 266, 275-76 (4th Cir. 2019)) (citation modified) ("<u>Scott</u> is the exception, not the rule, and we have clarified that it does not apply *even where* documentary evidence renders the plaintiff's story 'unlikely,' so long as it is not 'utterly discredited.'").

I.   **The district court erred in denying Plaintiffs' Motion for Partial Summary Judgment as to Count I .**

   a.   **Even in the light most favorable to Defendants, Defendant Borom violated Ms. Johnson's clearly established Fourth Amendment rights through excessive force when he killed her by shooting eight bullets at her after she had already been shot eight times and was incapacitated, after it was clear *from Defendant Borom's vantage point* that Sgt. Rugg had regained possession of the gun.[2]**

"Since 2005, it has been established that 'an imminent threat of serious physical harm to an officer is not sufficient to justify the employment of deadly force *seconds after the threat is eliminated* if a reasonable officer would have recognized when the force was employed that the threat no longer existed.'" Harris, 927 F.3d at 281 (quoting Waterman v. Batton, 393 F.3d 471, 482 (4th Cir. 2005)). "[A]lthough an exact factual match is not required to overcome a qualified immunity defense," since 2011, it has been "clear that even a police officer who has just survived a harrowing encounter that necessitated the use of deadly force to extricate himself may not continue to use deadly force once he has reason to know that his would-be assailant is lying on the ground wounded and unarmed[.]" Harris, 927 F.3d at 281 (citing Brockington v. Boykins, 637 F.3d 503, 507-08 (4th Cir.

---

[2] The first of Officer Borom's "volleys" of shots involved seven total shots; the second volley involved nine total shots. The eight shots which Plaintiffs focus upon here include all but the first shot fired in Officer Borom's second volley of shots.

2011)). <u>See</u> <u>also</u> <u>Estate of Jones v. City of Martinsburg</u>, 961 F.3d 661, 668 (4th Cir. 2020) (emphasis added) ("Because it was clearly established that officers may not shoot a secured *or* incapacitated person, the officers are not entitled to qualified immunity."); <u>Harrold v. Hagan</u>, ___ F.4th ___, 2026 WL 1145569, at *7 n. 8 (Apr. 28, 2026) (<u>quoting</u> <u>Waterman</u>, 393 F.3d at 481) (one of numerous decisions of this Court since <u>Waterman</u> recognizing that "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated").

Plaintiffs maintain that each and every shot fired at Ms. Johnson was unjustified—particularly so in the second volley. Notwithstanding Plaintiffs' broader position, Plaintiffs focus their argument here as follows: even in the light most favorable to Defendant Borom, his act of shooting Ms. Johnson eight times after she had already been incapacitated by a hail of bullets—*and* had been visibly disarmed from his vantage point —violated clearly established law in this circuit, dating back to at least 2005, holding that deadly force is unreasonable after the threat purportedly justifying such force is eliminated.

For the purposes of analyzing Plaintiffs' summary judgment motion only, Plaintiffs assume *arguendo* that the first shot fired by Officer Borom in his second "volley" was justified by an imminent threat of violence from Ms. Johnson.[3] Still,

---

[3] Plaintiffs acknowledge that their retained expert, Dr. Scott Mourtgos, opined that

Defendants Borom and Rugg both acknowledge that any such threat had been eliminated by the time Sgt. Rugg had regained possession of the gun. <u>See</u> JA1579, ll. 20-25 (deposition testimony of Officer Borom stating he assessed that Ms. Johnson was not a threat once he saw that Sgt. Rugg had disarmed her); JA1398, l. 12 – JA1399, l. 3 (deposition testimony of Sgt. Rugg opining that Ms. Johnson was not a threat to anybody after Sgt. Rugg had grabbed the gun and that there was no reason to believe that she presented a danger at that point).

Thus, to the extent there was ever any objectively reasonable justification for Officer Borom's use of force, it was unambiguously eliminated—*from Officer Borom's vantage point*—by the time that Officer Borom fired his second round in his second volley of shots and then proceeded to fire *seven more shots*. <u>See</u> <u>Borom's BWC 2</u>, 27:43-48; JA1041-1045 (Plaintiffs' expert report depicting a series of screenshots from Officer Borom's body camera footage clearly depicting Sgt. Rugg's possession of the gun beginning at the time of the second shot in

---

a reasonable officer could have perceived Ms. Johnson as a threat when the second volley of shots was *initiated*. (JA1040). Of course, Dr. Mourtgos' opinion is not dispositive on this issue. In any event, as Dr. Mourtgos recognized, any "objective imminent threat ceased after the second of Officer Borom's nine shots during the second volley." (JA1040). Based upon the video evidence, Plaintiffs respectfully submit that the threat had ceased *prior* to the second shot. <u>See</u> <u>Borom's BWC 2</u>, 27:43-48; <u>Rugg's BWC 2</u>, 44:10-44:15. To the extent this Court agrees with Dr. Mourtgos' opinion that the threat ceased *after* the second shot, Plaintiffs submit that they are still entitled to partial summary judgment with respect to the final seven shots, if not more.

Officer Borom's second volley); JA1584, ll. 9-13 (testimony of Officer Borom confirming that he firing *after* Sgt. Rugg had grabbed the gun).

There is no doubt that Officer Borom "ha[d] reason to know that [Ms. Johnson was] lying on the ground wounded and unarmed" and incapacitated at the time he fired eight shots at her after Sgt. Rugg had fully secured the gun in question. See Harris, 927 F.3d at 281 (citing Brockington, 637 F.3d at 507-08). The evidence that Ms. Johnson was "lying on the ground wounded and unarmed[,]" and incapacitated see id., was right in front of Officer Borom at the time he fired eight shots into her. See Borom's BWC 27:43-48; JA1041-1045. Nonetheless, even after Ms. Johnson lay on the ground, wounded, incapacitated and unambiguously disarmed after having been shot eight times, Officer Borom shot her *another eight times* based on his objectively unreasonable belief that she was still a threat. See JA1584, ll. 9-13 (transcript of Borom deposition):

Q. Did you keep firing after Sergeant Rugg grabbed the gun?

A. Yes, sir, I did.

Q. Why?

A. Because I still deemed her a threat.

The district court's analysis on the reasonableness of the second volley (JA11-12) leaves much to be desired. The district court appeared to view the nine separate gunshots fired in Officer Borom's second volley as a single, continuous

use of force, and invoked Eleventh Circuit case law[4] for the proposition that

Officer Borom was not required to interrupt his volley of bullets. (JA11-12). But

the district court's reasoning on this point runs headlong into this Court's opinion

in Harris, which stated the following:

> [O]ur case law . . . insists that "the reasonableness of force employed can turn on a change of circumstances during an encounter lasting only a few seconds[.]" Waterman, 393 F.3d at 481 (rejecting argument that reviewing subsequent shots separately from initial shot draws "artificial divisions in the sequence of events" (internal quotation marks omitted)). That shots are fired in "rapid succession," in other words, is not enough to establish, as a matter of law, that the risk of physical harm to Pittman that supported the first shot still existed at the time of the second and third . . . . See Brockington, 637 F.3d at 507 ("pars[ing] sequence of shots and finding that safety risk that justified initial shots did not justify subsequent shots once suspect, wounded, had fallen to ground).

927 F.3d at 274.

---

[4] Jean-Baptiste v. Gutierrez, 627 F.3d 816 (11th Cir. 2010) is both nonbinding and distinguishable. There, the officer in question "was confronted by a suspect of a dangerous crime who was lying in wait and holding a gun." Id. at 822. There is no dispute that the suspect was armed as the officer shot at a distance of eight to ten feet away. Id. at 819. While the parties disputed the point in the shooting at which the suspect fell to the ground, the suspect "never stated whether he retained or lost control of his gun when he fell[,]" the officer did not verify that the suspect was disarmed during the shooting, and there is no indication in the opinion that, to the extent the suspect was disarmed during the shooting, it would have been clear from the officer's vantage point. Id. at 819, 822

In any event, to the extent Jean-Baptiste suggests that officers need not reassess the reasonableness of their use of force as circumstances change, it is incorrect and irreconcilable with this Court's approach as set forth in Harris, 927 F.3d 266.

McLenagan v. Karnes, 27 F.3d 1002 (4th Cir. 1994), the other case upon which the district court relies in its analysis of the second volley, does not suggest a different result here. In that case, Officer Karnes was caught up in a chaotic scene at a makeshift magistrate's office and fired a single shot at a detainee who he came across after hearing another officer yell several times, while running: "The man has got a gun!" Id. at 1005. Officer Karnes then observed that McLenagan was unarmed and refrained from firing a second shot. Id. Nothing in McLenegan is inconsistent with the principles and reasoning in Harris set forth above.

Elliott v. Leavitt, 99 F.3d 640 (4th Cir. 1996), invoked by the district court earlier in its order, is similarly distinguishable. To be sure, Elliott found that in the excessive force context, the "number of shots by itself cannot be determinative as to whether the force used was reasonable." Id. at 643. But the circumstances in Elliott are inapposite here. There, two officers fired 22 shots at a suspect who had been arrested, was pointing his gun at officers, and did not respond to orders to drop the gun, when the gun "had remained clasped in Elliott's hand" after the shooting had concluded. Id. at 641-42. Here, Defendant Borom alone[5] fired eight shots at Ms. Johnson once Sgt. Rugg had unambiguously reclaimed sole possession

---

[5] The fact that Sgt. Rugg did not fire upon Ms. Johnson at this time is consistent with his belief that she did not pose a threat once she was disarmed, and indicative of the objective unreasonableness of Defendant Borom's belief that further deadly force was necessary.

of the gun after Ms. Johnson had, at most, temporarily placed her hand on the gun as she bled out on the floor.

Plaintiffs acknowledge that Caraway v. City of Pineville, g (4th Cir. 2024), an opinion issued after the shooting of Ms. Johnson and over a strong dissent, purported to "decline to extend" Waterman to the facts of that case, wherein a shooting occurred over the course of 3-4 seconds. Caraway is inapposite. There, this Court found that the record showed Mr. Caraway's gun was pointed at two of the officers in the moments before the shooting. Id. at 374; see also id. at 382 ("the undisputed evidence shows that just before the officers fired, Caraway's gun was pointed at French and Roberts"). The officers in that case "ceased" using force "the moment they knew" Mr. Caraway was no longer holding the weapon. Id. at 378 (quoting Caraway v. City of Pineville, 639 F.Supp.3d 560, 574 (W.D.N.C. Nov. 3, 2022)); see also Caraway, 639 F.Supp.3d at 568 (noting that the firing officers "immediately" stopped shooting when their fellow officers, who could see that Mr. Caraway no longer had a gun, yelled at them to do so). As the district court in that matter noted, "[f[rom their vantage point, neither officer could see Mr. Caraway drop his firearm[.]" Caraway, 639 F.Supp.3d at 576; see also id. at 567-68 ("From their positions, neither Roberts nor Griffin could see Plaintiff's right hand, and as such neither saw him drop the weapon."). Cf. Borom's BWC, 27:43-48 (body-worn camera footage from Officer Borom's vantage point clearly depicting Sgt.

Rugg recovering the weapon in question prior to Officer Borom firing eight shots at Ms. Johnson). Notably, the district court in <u>Caraway</u> specifically distinguished <u>Waterman</u> and <u>Brockington</u> by noting that "the threat to the officers and the public had not clearly been eliminated" and that Mr. Caraway was not "clearly unarmed" at the time of the shooting. 639 F.Supp.3d at 576-77. Here, there is no question Officer Borom fired numerous shots after Ms. Johnson was clearly disarmed, when any threat that she may have posed had been eliminated. <u>See</u> JA1579, ll. 20-25 (deposition testimony of Officer Borom indicating that he assessed that Ms. Johnson was not a threat once he saw that Sgt. Rugg had disarmed her); JA1398, l. 12 – JA1399, l. 3 (deposition testimony of Sgt. Rugg stating that Ms. Johnson was not a threat to anybody after Sgt. Rugg had grabbed the gun and that there was no reason to believe that she presented a danger at that point).

Below, the district court notably failed to acknowledge the existence of <u>Harris</u> and other consonant authorities.[6] Just like in <u>Harris</u>, here, the district court erred in failing to analyze the reasonableness of each successive gunshot in light of changing circumstances, instead treating all nine gunshots of the second volley as a single, undifferentiated use of force. <u>See</u> JA11 ("Johnson was not secured when

---

[6] It is implausible that the district judge below was unaware of <u>Harris</u>, given that this Court reversed the same judge in that matter for improperly granting summary judgment on qualified immunity grounds not once, but twice. <u>See</u> 927 F.3d at 268.

Borom fired the second round of shots. . . . At the time Borom fired his second round of nine shots, the officers reasonably perceived Johnson posed a continuing threat."). Just like in <u>Harris</u>, this Court should reverse.

In light of the video evidence, no reasonable jury could conclude that Officer Borom did not have "reason to know" that Ms. Johnson was "lying on the ground wounded and unarmed" at the time he fired the final eight gunshots into her. <u>Harris</u>, 927 F.3d at 281. These last eight shots, at a minimum, violated Ms. Johnson's clearly established Fourth Amendment rights. Partial summary judgment on Count I is appropriate.[7]

### b. Even in the light most favorable to Defendants, Defendant Rugg's inactions render him liable for Officer Borom's excessive force.

Plaintiffs incorporate by reference all relevant law and argument regarding Defendant Borom's unconstitutionally excessive use of force set forth above.

---

[7] As further discussed in Section II(b), <u>infra</u>, there appears to an intra-circuit split in this circuit regarding whether, in the qualified immunity context, the reasonableness of an officer's mistaken factual belief is a question of law for the court or a question of fact for the jury. Resolution of this question may be relevant to consideration of Plaintiffs' Partial Motion for Summary Judgment. Plaintiffs' position, further set forth in Section II(b), is that the reasonableness of an officer's mistaken factual belief is a generally a question of fact for the jury. However, given the undisputed facts in this case, Plaintiffs submit that Defendant Borom's asserted belief that Ms. Johnson posed a threat during the last eight shots of the second volley was objectively unreasonable, even viewing all facts in the light most favorable to Defendant Borom.

It is well-established in the Fourth Circuit that "[a]n officer may be liable under a § 1983 theory of bystander liability "if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." See, e.g., Simmons v. Whitaker, 106 F.3d 379, 384 (4th Cir. 2024) (quoting Randall v. Prince George's Cnty., Md., 302 F.3d 188, 204 (4th Cir. 2002)).

After Defendant Rugg abruptly tackled Ms. Johnson, Officer Borom's immediately incapacitated and disarmed her. Yet Defendant Rugg did absolutely nothing to stop Officer Borom's continued use of unnecessary deadly force, in violation of Ms. Johnson's constitutional rights, despite his ability to do so.

Notably, Defendant Rugg's deposition conclusively establishes his knowledge that the vast majority of Defendant Borom's second volley was excessive and unnecessary:

Q.     At that moment, based on your experience, once you grab the firearm, did you think that Ms. Johnson was a threat to anybody?

A.     Did I?

Q.     Your opinion.

A.     No.

Q.     Okay. And you're basing that on your many years of law enforcement training?

A.     I'm basing that on the fact that I had the actual gun in my hand and I knew that I was the possessor of that weapon at the time. Yes.

Q. And based on other factors, there was no other reason that she would present a danger at that moment?

A. Right. Right.

(JA1398, l. 12 – JA1399, l. 3). But despite Defendant Rugg's actual knowledge that Defendant Borom's continued use of lethal force was unnecessary—and thus constitutionally unreasonable—Sgt. Rugg took no steps to prevent the ongoing harm to Ms. Johnson, such as yelling at Detective Borom that it was unnecessary for him to continue shooting given Ms. Johnson's disarmament. Even viewing the facts in the light most favorable to Defendant Rugg, Ms. Johnson is entitled to partial summary judgment on Count I.

**II. The district court erred in granting Defendants' Motions for Summary Judgment as to Count I.**

**a. In the light most favorable to Plaintiffs, Defendant Borom violated Ms. Johnson's clearly established Fourth Amendment rights through excessive force when he initiated his first volley of shots at Ms. Johnson.**

Plaintiffs incorporate by reference all relevant law and argument regarding excessive force set forth in Section I, <u>supra</u>.

Ms. Johnson was undergoing a mental health crisis on the night of July 1, 2022. Although Defendant Borom apparently considered Ms. Johnson to be a threat warranting deadly force based on her possession of a firearm, in <u>Knibbs</u>, this Court held that "a police officer used unconstitutionally excessive force in shooting a man holding a firearm on his own property who was neither pointing the weapon

37

at the officer nor giving some other indicator of an immediate intent to harm." 30 F.4th at 217. See also Aleman v. City of Charlotte, 80 F.4th 264, 286 (4th Cir. 2023), cert. denied, 144 S. Ct. 1032, 218 L. Ed. 2D 187 (2024) ("[T]he mere possession of a firearm by a suspect is not enough to permit the use of deadly force.").

Contrary to Defendants' assertion, Ms. Johnson never wielded the firearm "wildly," but rather maintained it pointed to the ground at nearly all times. Although Ms. Johnson questioned the officers and their actions, she was calm, slow, non-threatening, and surrounded by her family, including her baby daughter, at all times. In the light most favorable to Plaintiffs, Ms. Johnson did not intentionally point her firearm at anyone but herself. Even Sgt. Rugg chuckled after Defendant Borom said the handgun was pointed at Sgt. Rugg while Ms. Johnson stood against the wall. (Rugg's BWC 2, 43:38). Notably, when Officer Borom pointed out that the gun was briefly pointed at Sgt. Rugg, Ms. Johnson moved the gun so that it was no longer pointed at him, reflecting a clear lack of any intentionality to harm or threaten the officers. (JA1402, l. 11 – JA1403, l. 3). Moreover, Sgt. Rugg testified that he never considered Ms. Johnson to be homicidal, but rather only suicidal, creating a genuine dispute of material fact on Defendants' perception of danger, as well as the reasonableness thereof. (JA1403, l. 4 – JA1404, l. 25).

Hence, viewing all facts in favor of Plaintiffs, Ms. Johnson could not be deemed a threat prior to Sgt. Rugg's decision to tackle her to the ground. To be sure, it is undisputed that after they landed on the floor, Ms. Johnson refused to hand over the firearm. Accordingly, it was only after they were on the floor that Sgt. Rugg deemed Ms. Johnson potentially homicidal. (JA1404, ll. 8-19). At this point, Defendant Borom aimed and shot his firearm at Ms. Johnson based on the perceived threat. See Cooper v. Sheehan, 735 F.3d 153, 159 (4th Cir. 2013) ("[D]eadly force may only be used by a police officer when, based on a reasonable assessment, the officer or another person is threatened with the weapon."). As Defendant correctly posits, Plaintiffs' expert concluded that, during the struggle for the firearm, "a reasonable officer . . . could have perceived that [Ms.] Johnson posed an imminent threat." (JA1040).

However, again, all facts must be weighed in favor of Plaintiffs at this stage, and, in doing so, this Court must carefully consider the entirety of the evidence preceding Defendant's decision to shoot at Ms. Johnson. Barnes v. Felix, 605 U.S. 73, 80-81 (2025):

> Of course, the situation at the precise time of the shooting will often be what matters most; it is, after all, the officer's choice in that moment that is under review. But earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones. . . . The history of the interaction, as well as other past circumstances known to the officer, thus may inform the reasonableness of the use of force.

Moreover, "opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." <u>Remy Holdings Intl., LLC v. Fisher Auto Parts, Inc</u>, 90 F.4th 217, 234 (4th Cir. 2024) (citing <u>United States v. McIver</u>, 470 F.3d 550, 561–62 (4th Cir. 2006)).

Based on the long interaction between Defendants, Plaintiffs, and Ms. Johnson, as well as Ms. Johnson's mental health and the lack of a sufficient preexisting threat, a jury could reasonably conclude that the deadly force employed was excessive. <u>Aleman</u>, 80 F.4th at 293 ("At bottom, a reasonable jury could review and interpret the video footage, consider the other evidence, and decide that [the plaintiff] did not pose an immediate threat to [the defendant officer] or anyone else at the moment [the defendant officer] shot him."). Prior to being tackled, Ms. Johnson was not aggressive, attempting to flee, or suspected of having committed any violent offense. Multiple officers interacted with her for a prolonged time, and even when she had the firearm in her home, she never posed a threat to Defendants. The threat was so non-existent, that the officers allowed and ordered the Iwanksis, L.J. and Jada Johnson to move around the house for hours. As the first shot was heard, Sgt. Rugg was immediately able to grab the handgun out of Ms. Johnson's hand, get up off the ground, and back away from Ms. Johnson. (<u>Rugg's BWC 2</u>, 44:00-44:08; <u>Borom's BWC 2</u>, 27:36-27:43). Ms. Johnson had been easily neutralized, yet Defendant continued to shoot. <u>Id</u>. A reasonable jury could conclude that the deadly force was excessive based on these facts and the totality of the circumstances that evening.

40



Borom 2, Defendants' Ex. A, 27:39.



Rugg 2, Defendants' Ex. A, 44:05.

In the light most favorable to Plaintiffs, Ms. Johnson only posed a threat to herself, not to the officers nor her family, so shooting at her repeatedly at point-blank range after she was tackled constituted excessive force. At this stage, there are genuine issues of material fact on whether Defendant needed to use deadly force considering the totality of the circumstances, so the issue must be left for the jury to decide.

> **b.** **In the light most favorable to Plaintiffs, Defendant Borom violated Ms. Johnson's clearly established Fourth Amendment rights through excessive force when he killed her by shooting nine bullets at her after she had already been shot seven times and was incapacitated.**

Plaintiffs incorporate by reference all relevant law and argument regarding excessive force set forth in Section I, <u>supra</u> (citing, <u>e.g.</u>, <u>Harris</u>, 927 F.3d 266; <u>Waterman</u>, 393 F.3d 471; <u>Brockington</u>, 637 F.3d 503; and <u>Jones</u>, 961 F.3d 661).

Defendant Borom's conduct—shooting and killing Ms. Johnson after she had already been incapacitated by a hail of bullets—violated the clearly established law in this circuit, dating back to at least 2005, that deadly force is unreasonable even mere seconds after the threat purportedly justifying such force is eliminated. In the light most favorable to Plaintiffs, the body-worn camera footage depicts Officer Borom firing nine bullets into Ms. Johnson—an incapacitated woman bleeding on the floor—beginning approximately six seconds *after* she had already been shot seven times by that same officer.  Jada Johnson had been shot multiple times, she was bleeding on the floor and incapacitated, and the thought that she could have collected herself within seconds, was unlikely.

Relying on the body camera footage and <u>Scott</u>, 550 U.S. 372, the district court found that Ms. Johnson "contort[ed] her hand in order to wrap her fingers around the handle of the gun at the trigger area" in an attempt to gain control of the weapon, that she did so after "collect[ing] herself or regain[ing] control of her faculties," and rejected Plaintiffs' suggestion that Ms. Johnson's hand had jerked involuntarily. (JA5-6, 6 n.1, 11). On this finding, the body camera footage is ambiguous and inconclusive. (<u>Rugg's BWC 2</u>, 44:08-44:13). While the footage does show that Ms. Johnson's hand is momentarily in very close proximity to or on the gun following the first round of shots, the video shows the firearm was laying pointed towards her, not with her fingers wrapped around the trigger as the court below held. In viewing this footage in a light favorable to Defendants, the district court failed to heed this Court's directive that documentary evidence does not trump traditional summary judgment principles and that <u>Scott</u> "does not apply *even where* documentary evidence renders the plaintiff's story unlikely, so long as it is not utterly discredited." <u>Lewis</u>, 98 F.4th at 529 (citation modified).

Further, assuming *arguendo* that the Court finds the first one or two shots of the second volley justified, to the extent this Court does not conclude that Plaintiffs are entitled to partial summary judgment, it should at a minimum find that, viewing the factors in the light most favorable to Plaintiffs, a reasonable jury could

43

conclude that the last seven or eight shots fired by Defendant Borom were unnecessary, gratuitous, and constitutionally unreasonable.

There is absolutely no question that the final shots by Defendant Borom would be deemed constitutionally unreasonable to the extent he was actually aware of the reality that Ms. Johnson did not pose a threat sufficient to warrant the use of deadly force at that time—i.e., after she had been disarmed by Sgt. Rugg.[8] See JA1579, ll. 20-25 (deposition testimony of Officer Borom indicating that Officer Borom assessed that Ms. Johnson was not a threat once he saw that Sgt. Rugg had disarmed her); JA1398, l. 12 – JA1399, l. 3 (deposition testimony of Sgt. Rugg stating that Ms. Johnson was not a threat to anybody after Sgt. Rugg had grabbed the gun and that there was no reason to believe that she presented a danger at that point).

To be sure, Defendant Borom denied any such awareness in his deposition. See JA1577, ll. 7-23; JA1579, l. 7 – JA1580, l. 4. But at trial, a jury would be more than entitled to discredit any such testimony as a self-serving, *post hoc* attempt by Officer Borom to justify his deadly force as objectively reasonable, when his use of force was in fact based on his misunderstanding of relevant principles governing

---

[8] Plaintiffs maintain that Defendant Borom's "reason to know" of such—i.e., that the disarming occurred directly in front of him—is sufficient to establish a violation of clearly established law, regardless of his actual knowledge. See Harris, 927 F.3d at 281; see generally Section I(a), supra.

the use of force. <u>See</u> JA1045-1046 (Plaintiff's expert report noting that Officer

Borom appeared to mistakenly conflate shooting until a threat is eliminated with

shooting a threat that is still moving, based on his interview, which, along with Dr.

Mourtgos' report, pre-dated his deposition).

Viewing the facts in the light most favorable to Plaintiffs, a reasonable jury

could infer from the video evidence—which clearly depicts the disarming of Ms.

Johnson from Defendant Borom's vantage point—that Defendant Borom was

aware that Ms. Johnson had been disarmed as he continued to fire.

Further, even if a jury concluded that Defendant Borom was actually

unaware that Ms. Johnson had been disarmed after being shot eight times, a

reasonable jury could certainly have concluded "that a perception by [Defendant

Borom] that [Ms. Johnson] posed a threat of serious physical harm to [him] would

have been unreasonable" after she was disarmed. <u>See</u> <u>Waterman</u>, 393 F.3d at 477.

Such a determination is rightfully within the province of the jury. <u>See</u> <u>id.</u>; <u>Franklin</u>

<u>v. City of Charlotte</u>, 64 F.4th 519, 531-32 (4th Cir. 2023) (finding that a

"reasonable jury" could conclude that defendant officer's mistake was

unreasonable); <u>Aleman</u>, 80 F.4th at 293 ("[A] reasonable jury could find that

Guerra mistakenly perceived that Galindo posed an immediate threat, but that

Guerra's mistake was not reasonable."); <u>Purnell</u>, 652 F.3d at 532 ("because

Purnell's use of force  could be viewed by a jury as objectively unreasonable, we

reverse and remand" when the force at issue was "based on a mistake of fact insofar as Purnell believed he was firing his Taser rather than his Glock").[9]

Notwithstanding these cases, Plaintiffs acknowledge that there appears to be a split of authorities within this Circuit regarding whether the reasonableness of an officer's mistake of fact is a legal question for the Court or a factual question for the jury. Petition for a Writ of Certiorari in <u>Green v. Tanner</u>, O.T. 2025, No. 267, pp. 16-17. <u>See</u> <u>Putman v. Harris</u>, 66 F.4th 181, 187 (4th Cir. 2023); <u>Armstrong v. Hutcheson</u>, 80 F.4th 508, 513 (4th Cir. 2023).

Plaintiffs note that <u>Purnell</u>, which contemplates that it is the role of the jury to assess the reasonableness of an officer's use of force *when premised upon a mistake*, was decided en banc and submit that it therefore controls notwithstanding the alternative approach of the panels in <u>Putman</u> and <u>Armstrong</u>. *See* <u>Purnell</u>, 652 F.3d at 537 (Davis, J., concurring) (recognizing the <u>Purnell</u> Court's holding that "whether . . . Deputy Purnell's mistaken use of his Glock pistol to shoot Henry was reasonable[ ] is a question for the jury and not properly determined as a matter of

---

[9] <u>Purnell</u> is factually distinguishable from the instant case in that it involves an officer's mistaken use of the wrong weapon rather than an officer's mistaken perception of a threat. Further, <u>Purnell</u> indicates that at summary judgment, "the question of whether the officer's actions were reasonable is a question of pure law." 652 F.3d at 531 (citing <u>Scott</u>, 550 U.S. at 381 n. 8. <u>But</u> <u>see</u> 652 F.3d at 552 n. 15 (Shedd, J., dissenting) (suggesting that the majority's invocation of this general principle is in tension with its decision to remand the matter to the jury to determine the reasonableness of the officer's conduct).

law"). Moreover, even if <u>Purnell</u> were deemed not to be controlling under the facts and circumstances in this case, <u>Waterman</u> and <u>Aleman</u> are directly on point here in that each hold a reasonable jury could find that a defendant officer's asserted but mistaken perception of a threat was unreasonable. <u>See</u> <u>also</u> <u>Franklin</u>, 64 F.4th at 531-32 (reasonableness of officer's mistake in shooting suspect was a question for the jury when a reasonable jury could have concluded that decedent did not pose an imminent threat, notwithstanding defendant officer's interpretation of his movement as threatening). Under <u>Waterman</u>, <u>Purnell</u>, <u>Franklin</u>, and <u>Aleman</u>, the reasonableness of Officer Borom's asserted perception–mistaken, if true–that Ms. Johnson posed a threat during the eight shots that Officer Borom fired, *after* she had been unambiguously disarmed from Officer Borom's vantage point, is a question presumptively within the province of the jury.

Of course, resolution of questions of fact generally within the province of the jury can in some instances be appropriate at summary judgment when no reasonable jury could adopt one side's version of the facts. As asserted in Section I(a), <u>supra</u>, Plaintiffs' position is that, in light of the video evidence, no reasonable jury could find Defendant Borom's purported (and, if genuine, undoubtedly mistaken) belief that Ms. Johnson continued to pose a threat after she had been disarmed by Sgt. Rugg to be reasonable. But assuming this Court does not so find,

Plaintiffs submit that at a minimum, the reasonableness of Defendant Borom's

asserted belief is a fact-bound question to be resolved by the jury at trial. [10]

> **c.** **In the light most favorable to Plaintiffs, Defendant Rugg's inactions render him liable for Officer Borom's excessive force.**

For the reasons set forth in Section I(b), <u>supra</u>, viewing the facts in the light

most favorable to Plaintiffs, the district court erred in granting Defendant Ruggs'

motion for summary judgment as to Count I—even if this Court finds that a triable

issue of fact precludes Plaintiffs' Motion for Partial Summary Judgment on Count

I as to Defendant Rugg.

---

[10] To the extent this Court disagrees that <u>Waterman</u>, <u>Purnell</u>, <u>Franklin</u>, and <u>Aleman</u> control as set forth by Plaintiffs here, Plaintiffs respectfully submit that en banc consideration of whether the reasonableness of an officer's mistake of fact is a legal question for the Court or a factual question for the jury may be appropriate. Consistent with <u>Waterman</u>, <u>Purnell</u>, <u>Franklin</u>, and <u>Aleman</u>, Plaintiffs note that at least four circuits appear to have held that the reasonableness of an officer's mistake of fact is a question for the jury. Petition for a Writ of Certiorari in <u>Green v. Tanner</u>, O.T. 2025, No. 267, pp. 11-14. On the other hand, at least two circuits treat the reasonableness of an officer's mistake of fact as a question of law for the court. <u>Id.</u>, pp. 14-16. The majority view, which Plaintiffs submit is currently the controlling law of this circuit is consistent with Justice Gorsuch's recognition that, in Fourth Amendment excessive force cases, at common law, reasonableness under the totality of the circumstances was a question for the jury. *See* Tr. of Oral Arg. at 37, <u>Barnes</u>, 605 U.S. 73.

**III.  The district court erred in granting Defendants' Motions for Summary Judgment as to the state law counts.**

As relevant here, Defendants brought state law claims for Wrongful Death (Count II), Survivorship (Count III), Intentional Infliction of Emotional Distress (Count IV), Negligent Infliction of Emotional Distress (Count V), Negligent Execution of Official Duties (Count VI), Assault (Count VIII), and Battery (Count IX).[11]

Below, with very minimal differentiation between separate claims, the district court granted summary judgment in favor of defendants on all state law claims, invoking two separate grounds. First, the district court found that Defendants were entitled to public official immunity. (JA13). In doing so, the district court rejected Plaintiffs' argument that Defendants actions were outside of the scope of their authority due to their violation of Fayetteville Police Department policies. (JA13). Second, the district court found that Defendants' use of force was reasonable. (JA13-14).

The district court's opinion was in error. Upon a de novo review of Defendants' summary judgment motion as to the state law counts, this Court should find that Plaintiffs are entitled to their day in court on all counts.

---

[11] Count VII, a Negligent Hiring, Training, and Supervision claim against the City of Fayetteville, was disposed of in a separate motion and is not a subject of this appeal.

**a.** **In the light most favorable to Plaintiffs, Defendants' actions were both outside the scope of their duties and malicious due to their unreasonable use of force.**

**i.** **Public official immunity does not apply to law enforcement action that is malicious or outside the scope of authority.**

Plaintiffs incorporate by reference all relevant law and argument respecting Defendants' unconstitutionally excessive use of force set forth above.

"North Carolina law regarding the immunity of government actors from suit for state law claims differs from the law of immunity in federal § 1983 actions." Showalter v. N. Carolina Dep't of Crime Control & Pub. Safety, 183 N.C. App. 132, 136, 643 S.E.2d 649, 652 (2007). See also Cloaninger ex rel. Est. of Cloaninger v. McDevitt, 555 F.3d 324, 335 (4th Cir. 2009) ("Qualified immunity against state law claims under North Carolina law requires a substantively different analysis from qualified immunity against a claim brought under 8 U.S.C. § 1983 alleging the violation of a federal right.").

Unlike the doctrine of qualified immunity doctrine set forth as a matter of federal law applicable to federal claims, there is no "clearly established" prong of North Carolina's public official immunity doctrine, under which "an officer is immune *only* when he '*lawfully* exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, *and* acts without malice or corruption.'" Est. of Graham v. Lambert, 385

N.C 644, 654, 898 S.E.2d 888, 898 (2024) (quoting <u>Smith v. State</u>, 289 N.C. 303, 331, 222 S.E.2d 412, 430 (1976)) (emphasis added).

While under some circumstances, officers are authorized by North Carolina law to use deadly force, "the notion that unjustified use of deadly force may lead to civil liability" is "implicit" in North Carolina's deadly force statute. <u>See</u> <u>Hart v. Brienza</u>, 246 N.C. App. 426, 432, 784 S.E.2d 211, 216 (2016) (quoting <u>Wilcox v. City of Asheville</u>, 222 N.C. App. 285, 291, 730 S.E.2d 226, 231 (2012)).; N.C. Gen. Stat. § 15A-401(d)(2). Accordingly, "allegations that defendants used excessive force [can] support a finding that defendants' actions were beyond the scope of authority to use deadly force" and thus outside the scope of protection offered by public official immunity. <u>Prior v. Pruett</u>, 143 N.C. App. 612, 624, 550 S.E.2d 166, 174 (2001). <u>See</u> <u>also</u> <u>Hart,</u> 246 N.C. App. at 437, 784 S.E.2d at 219 (citation modified) ("A triable issue of fact exists as to whether Officer Brienza exceeded the scope of his lawful authority to use deadly force under the circumstances, which would pierce the cloak of his public official immunity to which he is otherwise entitled."); <u>Knibbs</u>, 30 F.4th at 228 (citing <u>Hensley</u>, 876 F.3d at 587-88):

> The same facts that a jury could find that would permit the conclusion that [an officer's] use of force was unreasonable under the Fourth Amendment would also permit a finding that he acted contrary to his duties as a law enforcement officer because he violated the use of deadly force statute.

Independently, an act is malicious as to overcome a claim of public official immunity if it is "(1) done wantonly, (2) contrary to the actor's duty, and (3) intended to be injurious to another." Knibbs, 30 F.4th at 227 (quoting Wilcox, 730 S.E.2d at 230)). Importantly, the third element of intent to injure "can either be 'actual' or constructive.'" Id. (quoting Wilcox, 730 S.E.2d at 231)). The constructive intent can be satisfied by a showing "that the defendant's actions were so reckless or so manifestly indifferent to the consequences, where the safety or life or limb is involved, as to justify a finding of [willfulness] and wantonness equivalent in spirit to an actual intent." Knibbs, 30 F.4th at 228 (citation modified).

Finally, while an officer's violation of a clearly established right is not a necessary condition for a plaintiff to overcome the doctrine of public official immunity, it is sufficient to do so. See Cooper, 735 F.3d at 160 (officers who violate a clearly established right act with malice and therefore are not entitled to public official immunity). It is "clearly established that a North Carolina law enforcement officer [can] use deadly force only when reasonably necessary to defend against 'the use of or imminent use of deadly physical force.'" Id. (quoting N.C. Gen. Stat. § 15A-401(d)(2)(a)). See also Hensley on Behalf of North Carolina v. Price, 876 F.3d 573, 587-88 (4th Cir. 2017) (officers were not entitled to public official immunity at summary judgment when, taking the evidence in the light most favorable to the plaintiffs, their "use of deadly force was not reasonably necessary under the circumstances").

52

### ii. Defendants are not entitled to public official immunity due to their unreasonable use of force.

Here, Plaintiffs have overcome the bar of public official immunity for three reasons. First, as set forth above, Defendants are not entitled to qualified immunity. No further analysis is required to find that Defendants are not entitled to public official immunity. See Cooper, 735 F.3d at 160 (officers who violate a clearly established right act with malice and therefore are not entitled to public official immunity).

Second, Defendants are not entitled public official immunity because they acted outside the scope of their lawful authority by using deadly force that was not reasonably necessary under the circumstances as elaborated below. See Prior, 143 N.C. App. at 624, 550 S.E.2d at 174 (2001); Hart, 246 N.C. App. at 437, 784 S.E.2d at 219.[12] Plaintiffs will not here belabor their previous arguments as to why Defendants' use of deadly force was unreasonable, but instead incorporate by

---

[12] But see Franklin, 64 F.4th at 537 n. 3 (stating, in dicta and without analysis, that "[e]ven if a police officer acting under the color of state law violates North Carolina's use-of-deadly-force statute, that officer may still receive public official immunity from a wrongful death suit brought against her in her individual capacity"). The case that Franklin appears to cite for this proposition does not support it. See Mills v. Duke Univ., 234 N.C. App. 380, 759 S.E.2d 341, 344 (2014) (affirming grant of summary judgment to defendant officers on public official grounds without so holding, and without any suggestion that defendant officers had used unreasonable force or violated North Carolina's use-of-deadly-force statute).

reference all relevant law and argument regarding Defendants' unconstitutionally excessive use of force set forth above.

Third, Defendants are not entitled to public official immunity because they acted maliciously. See Knibbs, 30 F.4th at 227. Defendants' actions were wanton in that the deadly force employed against Ms. Johnson was committed "needlessly, manifesting a reckless indifference to the rights of others." Id. at 228 (quoting Grad v. Kaasa, 312 N.C. 310, 321 S.E.2d 888, 890-91 (1984)). Defendants' actions were "contrary to" Defendants' "known duties" because the force used was unreasonable in violation of North Carolina's deadly force statute. Knibbs, 30 F.4th at 227-228. And Defendants' actions were at least constructively—if not actually—intended to be injurious to Ms. Johnson, to the extent that the force was, if not specifically intended to kill Ms. Johnson, employed in a manner "so reckless [and] so manifestly indifference of the consequences . . . as to justify a finding of [willfulness] and wantonness equivalent in spirit to an actual intent." Id. at 228 (quoting Wilcox, 730 S.E.2d at 231).

Importantly, as a matter of state law, the question of constructive intent "is a factual one . . . which North Carolina courts typically reserve for a jury." Knibbs, 30 F.4th at 228; see also id. (recognizing that the reasonableness of an officer's actions, for the purpose of determining wantonness, "presents a classic jury question").

Viewing the facts in the light most favorable to Plaintiffs, Defendants are not entitled to summary judgment on the state law claims on the grounds of public official immunity or reasonable use of force. This Court should reverse the district court's grant of summary judgment on the state law claims.

**b.** **In the light most favorable to Plaintiffs, Defendants' actions were outside the scope of their duties due to their failure to abide by departmental policies governing interactions with individuals experiencing mental illness.**

The district court also rejected Plaintiffs' argument that Defendants acted outside the scope of their authority by virtue of their failure to abide by Fayetteville Police Department Operating Procedure 3.14, which provides that, when responding to a call appearing to involve a mental health crisis:

> When possible the closest available CIT officer should be directed to respond to the call as one of the responding officers. . . . If a call is received that is not immediately recognized as a mental health crisis response call, however [sic] if the first arriving officer on the scene determines that a CIT officer is needed, the first arriving officer will request a CIT certified officer to respond.

(JA160).

The district court made a factual finding that this was a discretionary policy that Defendants did not violate. (JA13). In the light most favorable to Plaintiffs, this finding was error. Dr. Scott Mourtgos, Plaintiffs' expert, noted in his report that the phrase "will request a CIT certified officer to respond" renders the policy mandatory and opined that responding officers in this matter "acted contrary to

55

generally accepted practices and violated Fayetteville Police Department's operating procedures" in failing to request the response of a CIT officer in accordance with Fayetteville Police Department Operating Procedure 3.14.4. (JA1035-1036). A reasonable jury could credit Dr. Mourtgos' opinion that Defendants' failure to contact a CIT officer to respond violated Fayetteville Police Department policy, particularly in light of Ms. Johnson's exhibition of behaviors indicative of mental illness identified in Operating Procedure 3.14, which police officers are trained to recognize. (JA1034-1035).

Moreover, the district court entirely failed to address Plaintiffs' independent legal theory that Defendant Rugg separately violated Fayetteville Police Department policy governing interaction with individuals experiencing mental illness through his conduct. See Fayetteville Police Department Operating Procedure 3.14.5 (JA160-161). As Dr. Mourtgos opined, Sgt. Rugg's actions— specifically, threatening arrest and yelling at Ms. Johnson immediately prior to her producing a handgun and threatening suicide—were also in violation of Fayetteville Policy Department policy 3.14. (JA1036).

Police officers do not have discretion to violate departmental policy, and therefore, violation of departmental policy is outside the scope of Defendants' duties. Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could have found that Defendants were acting outside the scope of their

authority at the time Defendant Borom killed Ms. Johnson as a consequence of Defendants' violation of binding policy governing interaction with mentally ill individuals, and that these violations constituted both a breach of Defendants' duty of care and the actual and proximate cause of Ms. Johnson's death and Plaintiffs' injuries. See Epps v. Duke Univ., Inc., 116 N.C. 305, 308, 447 S.E.2d 444, 447 (1994) (allegations that defendant acted beyond the scope of official duties by "authorizing and/or supervising an autopsy allegedly involving procedures not routinely performed" were sufficient to state a claim against public officer); Lightner v. Inlivian, No. 3:23-cv-846-MOC-SCR, 2025 WL 2405627, at *4 (W.D.N.C. Aug. 7, 2025) (finding that Plaintiff had raised issues of fact as to whether defendant "was acting outside the scope of her lawful authority" based on evidence suggesting defendant may have "instructed Plaintiff to perform or to not perform certain duties, in violation of HUD regulations or FHA policies").

Plaintiffs are entitled to their day in court, and this Court should reverse the district court's granting of summary judgment as to the state law claims.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court reverse the judgment below, vacate the district court's grant of summary judgment to Defendants, and remand with directions that the district court grant Plaintiffs' motion for partial summary judgment as to Count I.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs submit that oral argument would aid in the Court's decision-making process in this case, which involves a highly fact-bound analysis of a record regarding which counsel will be particularly familiar. Further, this case raises the issue of an apparent intra-circuit split regarding whether, in the qualified immunity context, the reasonableness of an officer's factually mistaken perception of a threat is a fact-laden question presumptively within the province of the jury or a question of pure law solely within the province of the court. Finally, this case raises what appear to counsel to be an issue of first impression regarding the application of North Carolina's public official immunity statute to circumstances wherein police officers act in violation of departmental policy. For all these reasons, and any further reasons which may be apparent to the Court, oral argument is warranted in this case.

DATED: June 11, 2026

SUBMITTED BY:
/s/ Carnell Johnson
Carnell Johnson
JOHNSON & NICHOLSON, PLLC
5806 Monroe Rd Ste 102
Charlotte, NC 28212
Phone: 704-375-1911
Fax: 704-375-1919
Email: cj@johnnichlaw.com
*Counsel for Appellant*

**CERTIFICATE OF COMPLIANCE WITH**
**TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND**
**TYPE STYLE REQUIREMENTS**

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that:

1. The foregoing Brief complies with the type-volume limitations of Rule 32(a)(7). The Brief contains <u>12,543</u> words according to the Microsoft Word 2010 word-counting function, excluding the parts of the Brief exempted by Federal Rules of Appellate Procedure 32(f).

2. The foregoing Brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The Brief has been prepared in a proportionately spaced typeface using Microsoft Word 2010 in 14 point Times New Roman type style.

DATED: June 11, 2026

<u>/s/ Carnell Johnson</u>
Carnell Johnson
JOHNSON & NICHOLSON, PLLC
5806 Monroe Rd Ste 102
Charlotte, NC 28212
Phone: 704-375-1911
Fax: 704-375-1919
Email: cj@johnnichlaw.com
*Counsel for Appellant*
